# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

A.D. an individual,

      Plaintiff,

   vs.

CAVALIER MERGERSUB LP
F/K/A COREPOINT LODGING,
INC.;
WYNDHAM HOTELS & RESORTS,
INC.;
LA QUINTA HOLDINGS, INC.;
LQ MANAGEMENT L.L.C.;
LA QUINTA FRANCHISING LLC;
and
CPLG FL PROPERTIES, LLC
F/K/A LQ FL PROPERTIES,

      Defendant(s).

Case No.: 2:22-cv-00649

COMPLAINT

DEMAND FOR JURY TRIAL

## COMPLAINT

COMES NOW the Plaintiff A.D. ("Plaintiff" or "A.D."), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## INTRODUCTION

1.     For decades, criminal sex traffickers have brazenly operated in and out of hotels throughout this country. Victims of sex trafficking are taken to hotel and

motel rooms to be repeatedly trafficked, sexually assaulted, demeaned and left with multiple unaddressed injuries, while hotel operators and hospitality giants pay lip service to campaigns against sex trafficking, turning a blind eye to criminal misconduct and collecting profits from the criminal misconduct at the expense of human life, human rights, and human dignity.

2.    All Defendants know and have known for decades that sex trafficking repeatedly occurs at their respective locations and under their flags throughout the country. Rather than taking timely and effective measures to thwart this epidemic, Defendants have instead chosen to ignore and thereby facilitate commercial sex trafficking on their properties, enjoying the monetary profit and other benefits stemming from rooms rented for the purpose of sex trafficking, while making no attempt to raise awareness or put an end to the repeated abuses of victims at their properties.

3.    This action for damages is brought by the Plaintiff, a survivor of sex trafficking hereinafter identified by her initials A.D., under the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (hereinafter "TVPRA").

4.    A.D. was trafficked for commercial sex in Hillsborough, Lee, and Collier Counties in Florida. A.D. was sold via commercial sex transactions at the Defendants' hotel property, where force, fraud, and coercion were used against

her, while Defendants turned a blind eye and continued to benefit.

5. A.D. was advertised for sex on various websites known for trafficking, whereby Defendants provided open access to these known websites permitting traffickers and buyers to enable, facilitate, and otherwise assist in the harboring of A.D. for the purpose of sex trafficking.

6. Upon information and belief, these websites were repeatedly used by the trafficker to control and arrange for A.D. to be sold repeatedly to buyers who frequented the Defendants' hotel property to purchase victims of sex trafficking, including A.D.

7. With knowledge of the problem, and as a direct and proximate result of Defendants' multiple failures to act, mandate, establish, execute, and/or modify their anti-trafficking efforts on their hotel properties, A.D. was sex trafficked, sexually exploited, and victimized repeatedly at Defendants' hotel.

8. The Plaintiff brings this action pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1595, against the Defendants who, motivated by profits and the value of the "good will" of their brand, refused to institute meaningful steps to stop trafficking, and instead continued to operate a venture which enabled, harbored, held, facilitated, or any combination of the foregoing, the repeated and continuous trafficking, exploitation, and victimization of A.D. for their own benefit.

3

9.    The Plaintiff brings this action for damages against the Defendants listed herein for knowingly benefiting from facilitating a venture that they knew, or should have known, to be engaging in sex trafficking in violation of the TVPRA. Defendants turned a blind-eye to more than a decade of direct knowledge regarding anti-trafficking efforts and failed in their mandated and assumed duties to protect Plaintiff and others from sex trafficking.

## PARTIES

10.    Plaintiff A.D. is a natural person who resides in Collier County, Florida.

    a.  Plaintiff A.D. was living at home with her parents, fully employed and enrolled in college when she was first beckoned to a hotel where she was fraudulently induced, coerced and sexually assaulted before being sold for the purposes of commercial sex throughout Hillsborough and Collier Counties. The Plaintiff is a victim of trafficking pursuant to 22 U.S.C. §7102 (17) and a victim of a "severe form of trafficking" as it is defined under 22 U.S.C §7102 (16).

    b.  Due to the sensitive, private, and potentially retaliatory nature of the allegations, this Court has granted Plaintiff A.D.'s request to proceed under a pseudonym to ensure Defendants keep Plaintiff's identity confidential throughout the pendency of the lawsuit

thereafter.[1]

11.    Defendant Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc ("CPLG"), is a publicly traded company that was a spin-off from La Quinta Holdings ("LQH") when LQH sold its franchising and management businesses to Wyndham Worldwide Corporation ("Wyndham Hotels & Resorts, Inc." or "Wyndham") in 2018.

> a.  Defendant Cavalier MergerSub LP became the successor entity to CorePoint Lodging, Inc. ("CPLG"). Defendant Cavalier MergerSub LP retains successor liability for wrongful acts of its predecessor CPLG.
>
> b.  Defendant CPLG became one of the successor entities to La Quinta Holdings, Inc. ("LQH") when LQH underwent a corporate spin-off into two separate companies: CPLG and Wyndham. Defendant CPLG, retains successor liability for wrongful acts of its predecessor LQH.
>
> c.  CPLG maintained the same headquarters, management, employees, and real estate properties as LQH.
>
> d.  CPLG continued to hold the real property for La Quinta® branded hotels, while continuing to make key management, financial and

---

[1] *A.D. v. CorePoint Lodging*, No. 2:22-cv-00095, ECF No. 159.

operating decisions for La Quinta branded properties alongside Defendant Wyndham. CPLG headquarters are at 909 Hidden Ridge, Suite 600, Irving, Texas 75038.

e. Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. ("CPLG") is a Delaware corporation which owns, maintains and profits from the hotel properties where Plaintiff was trafficked: La Quinta Inn® Tampa Bay Airport. Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc. can be served by its registered agent Cogency Global Inc., 850 New Burton Road, Suite 201, Dover, DE 19904.

f. Defendant CPLG is and was involved in the operations and management of the La Quinta Inn® Tampa Bay Airport, where the Plaintiff was trafficked for commercial sex.

12. Defendant CPLG FL Properties, LLC f/k/a LQ FL Properties, ("CPLG FL") doing business as the La Quinta Inn® Tampa Bay Airport ("La Quinta Tampa Bay Airport"), is a limited liability company. CPLG FL is a subsidiary of CorePoint Lodging, Inc. Defendant CPLG FL was involved in the operation and management of the La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607 where the Plaintiff was trafficked for sex. Through Defendant CPLG, and the perpetrators who trafficked A.D. at the La Quinta Tampa Bay Airport, Defendant CPLG FL knowingly benefited or received something of value from its facilitation

of or participation in a venture which it knew or should have known had engaged in sex trafficking. Defendant CPLG FL may be served with service of process by serving its registered agent, Corporation Service Company, at 1201 Hays Street, Tallahassee, Florida 32301.

      a. CPLG, through its relationship with the Defendants La Quinta Holdings ("LQH"), La Quinta Franchising LLC ("LQF"), LQ Management L.L.C. ("LQM"), Wyndham Hotels and Resorts ("Wyndham"), CPLG FL Properties, and the perpetrators who trafficked A.D. at the La Quinta hotels, knowingly benefited or received something of value from its facilitation of or participation in a venture which it knew or should have known had engaged in sex trafficking.

      b. Defendant CPLG's headquarters are at 909 Hidden Ridge, Suite 600, Irving, Texas 75038 and the corporation may be served with service of process by serving its registered agent, CSC-Lawyers Incorporating Service, Company, at 7 St. Paul Street, Suite 820, Baltimore, Maryland 21202.

13. During the trafficking period Defendant La Quinta Holdings, Inc. ("LQH") was a large publicly traded hotel brand consisting of La Quinta real estate holdings, La Quinta Franchising LLC ("LQF") and LQ Management L.L.C.

("LQM"). Prior to the spinoff into CPLG in 2018, LQH was a publicly traded Delaware corporation. LQH can be served by its registered agent, Corporate Creations Network Inc., at 3411 Silverside Road – Tatnall Building, Suite 104, Wilmington, Delaware 19810.

    a. During the trafficking period, Defendant LQ Management L.L.C. was a wholly owned subsidiary of La Quinta Holdings, and was a Texas corporation located at 909 Hidden Ridge, Suite 600, Irving, Texas 75038.  LQM is now headquartered at 22 Sylvan Way, Parsippany, New Jersey 07054 and can be served by its registered agent Corporate Creations Network Inc., at 3411 Silverside Road – Tatnall Building, Suite 104, Wilmington, Delaware 19810.

    b. During the trafficking period, Defendant La Quinta Franchising LLC was a wholly owned subsidiary of LQH, and was a Texas corporation located at 909 Hidden Ridge, Suite 600, Irving, Texas 75038. LQF is and always has been a Nevada limited liability corporation. La Quinta Franchising LLC is currently headquartered at 22 Sylvan Way, Parsippany, New Jersey 07054 and can be served by its registered agent Corporate Creations Network Inc., at 8275 Southeastern Avenue #200, Las Vegas, Nevada 89123.

    c. During the period of trafficking LQH, together with its fully owned

subsidiaries, LQM and LQF conducted and operated businesses throughout the state of Florida. In 2018, LQH conducted a spinoff becoming CPLG and selling the La Quinta® brand, including LQF and LQM to Defendant Wyndham. LQH created CPLG to hold real estate, however, upon information and belief, CPLG did not passively hold La Quinta® branded real estate, but continued to make critical management and business decisions for the La Quinta® branded properties it held an interest in.

d.  For the reasons outlined above the "La Quinta Defendants" include LQH, LQM, LQF, CPLG, CPLG FL Properties and Wyndham.

e.  La Quinta Inn® by Wyndham Tampa Bay Airport ("La Quinta Tampa Bay Airport") is a former LQH property, currently owned, operated and managed by Defendants CPLG and Wyndham. During the trafficking period La Quinta Defendants owned, supervised, and/or operated the La Quinta hotel located at 4730 West Spruce Street, Tampa, Florida 33607.

f.  The La Quinta Inn® brand operates in forty-nine (49) states. The brand's assets are strategically located throughout the United States – close to amusement parks, airports, freeways, and other thoroughfares and the majority of these properties are currently

owned and managed by Defendants CPLG, Wyndham, as well as LQF and LQM.

g.  During the trafficking period La Quinta Defendants conducted and operated businesses throughout the state of Florida, and La Quinta Defendants still in business continue to conduct and operate businesses through the state of Florida.

h.  The La Quinta Defendants are subject to the jurisdiction of this Court because they regularly conduct business in the State of Florida; derive substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida such as the La Quinta hotels; have caused indivisible injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at their hotels.

i.  The La Quinta Defendants are the principal in an agency relationship with the La Quinta hotels.  In addition to the La Quinta Defendants' liability under TVPRA section 1595, the La Quinta Defendants are vicariously liable for the acts and/or omissions of the staff at their La Quinta hotels and all of their franchisee hotels.

j.  The La Quinta hotel where A.D. was trafficked have apparent agency for the La Quinta Defendants so as to establish vicarious

liability under Florida law, in addition to an actual agency relationship.

k.  The La Quinta Defendants have ratified the actions and inactions of the La Quinta branded hotels.

l.  The La Quinta Defendants exercise day-to-day control over the La Quinta branded hotels through their brand standards and retain control over the La Quinta branded hotels under the terms of their franchise agreement.

m.  As an integrated enterprise and/or joint employer, Defendants, including the La Quinta Defendants, are separately and jointly responsible for compliance with all applicable laws.

n.  As an integrated enterprise and/or joint employer, Defendants, including the La Quinta Defendants, are jointly and severally liable for any damages caused by their employees.

o.  As the principal and as a hotel operator, the La Quinta Defendants control the training, policies, and decisions on implementation and execution of policy for its branded properties, including the La Quinta hotel where Plaintiff was trafficked.

p.  The La Quinta Defendants maintain that they consider guest safety and security to be important and require the hotels in their portfolio

to comply with La Quinta brand standards and all local, state, and federal laws.

q.  Upon information and belief, the La Quinta Defendants control a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by the La Quinta Defendants, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at the La Quinta Inn® hotel where A.D. was trafficked.

r.  Through the La Quinta Defendants' relationship with the staff at the La Quinta Inn® hotel where A.D. was trafficked and where A.D.'s traffickers were guests or visitors, the La Quinta Defendants knowingly benefited, or received something of value, from their participation in a venture which they knew or should have known

to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which the La Quinta Defendants are entitled to under the franchise agreements.

s. The La Quinta Defendants benefited financially from room rentals and other incidentals recognized by renting rooms in which the Plaintiff was sex trafficked.

t. The La Quinta Defendants have benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

14. Defendant Wyndham Hotels and Resorts, Inc. ("Wyndham") is one of the largest hotel brands in the world with nearly 9,000 branded properties in more than eighty (80) countries. It is headquartered at 1 Sylvan Way, Parsippany, New Jersey 07054. Wyndham Hotels and Resorts, Inc. is a Delaware corporation and can be served by its registered agent, Corporate Creations Network, Inc., at 3411 Silverside Road, Tatnall Building Suite 104, Wilmington, Delaware 19810.

a. Defendant Wyndham Hotels and Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. Defendant Wyndham Hotels and Resorts, Inc. retains successor liability for wrongful acts of its predecessor, Wyndham Worldwide Corporation and La

Quinta Holdings, Inc.

b.  Defendant Wyndham purchased La Quinta's management (LQM) and franchise (LQF) businesses in 2018 from LQH. Defendant Wyndham Hotels & Resorts, Inc. and Defendant CPLG are the successor entities to La Quinta Holdings, Inc. ("LQH"). Defendant Wyndham retains successor liability for wrongful acts of its predecessor LQH.

c.  Defendant Wyndham, in conjunction with the La Quinta Defendants, owned, supervised, and/or operated the La Quinta Tampa Airport ("La Quinta Tampa Bay Airport") located at 4730 West Spruce Street, Tampa, Florida 33607 where A.D. was trafficked.

d.  Defendant Wyndham, in conjunction with the La Quinta Defendants, conducts and operates business throughout the state of Florida.

e.  Defendant Wyndham, in conjunction with the La Quinta Defendants, are subject to the jurisdiction of this Court because they regularly conduct business in the State of Florida; derive substantial revenue from services rendered in Florida, including through the operation of numerous hotels in Florida; has caused indivisible

14

injuries to A.D. in Florida; and profited from illegal sex trafficking involving Plaintiff at its hotel.

f. Defendant Wyndham, in conjunction with the La Quinta Defendants, are the principals in an agency relationship with the La Quinta hotels. In addition to Wyndham and the La Quinta Defendants' liability under TVPRA Section 1595, Wyndham and the La Quinta Defendants are vicariously liable for the acts and/or omissions of the staff at its La Quinta properties.

g. The La Quinta hotels where A.D. was trafficked have apparent agency for Defendant Wyndham, including La Quinta Defendants, so as to establish vicarious liability under Florida law, in addition to actual agency relationships.

h. Defendant Wyndham, including La Quinta Defendants, ratified the actions and inactions of La Quinta hotels.

i. Defendant Wyndham, including La Quinta Defendants, exercise day-to-day control over La Quinta hotels through its brand standards and retain control over La Quinta properties under the terms of its operating and franchise agreements.

j. Defendant Wyndham, including La Quinta Defendants, and the La Quinta hotels are a single and joint employer with a high degree of

interrelated, intermingled, and unified operations at the La Quinta hotels where the Plaintiff was trafficked for sex. Defendant Wyndham, including La Quinta Defendants, and the La Quinta properties each share the common policies and practices complained of herein.

k. Defendant Wyndham, including La Quinta Defendants, jointly employ or ratify the employment of individuals through horizontal joint employment and/or vertical joint employment at the La Quinta properties.

l. As an integrated enterprise and/or joint employer, Defendant Wyndham, including La Quinta Defendants, are separately and jointly responsible for compliance with all applicable laws that apply to the La Quinta properties.

m. As an integrated enterprise and/or joint employer, Defendant Wyndham, including La Quinta Defendants, are jointly and severally liable for any damages caused by employees of the La Quinta hotels.

n. As the principal and as a hotel operator, La Quinta Defendants, including Defendant Wyndham, controls the training, policies, and decisions on implementation and execution of policy for its La

Quinta properties, including the La Quinta hotel where Plaintiff was trafficked.

o. Defendant Wyndham, including the La Quinta Defendants, maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with La Quinta® and Wyndham brand standards and all local, state, and federal laws.

p. Upon information and belief, the Defendant Wyndham, including La Quinta Defendants, control and benefit from a uniform and required reservation and marketing system, credit processing system, training and policy on brand standards, including any standards, or lack thereof, on human trafficking, hotel furniture, amenities, food and beverages, cleanliness, or other hotel brand related policies published and communicated via property management systems with back-end management by Defendant Wyndham, including La Quinta Defendants, Wi-Fi qualifications and/or Wi-Fi providers, language and policy used on internet landing pages, thresholds for cybersecurity, including internet access logs, filtering and/or other guest protections, systems used to monitor customer reviews and responses, and other systems

related to the daily operations at the La Quinta hotels where A.D. was trafficked.

q.  Through the La Quinta Defendants' relationship with the staff at the the La Quinta Inn hotels where A.D. was trafficked and where A.D.'s traffickers were guests or visitors, La Quinta Defendants, including Defendant Wyndham, knowingly benefited, or received something of value, from its participation in a venture which it knew or should have known to engage in sex trafficking through, *inter alia*, royalty payments, licensing fees, and percentages of the gross room revenue which La Quinta Defendants, including Wyndham, are entitled to under operating and franchise agreements.

r.  Defendant Wyndham, in conjunction with the La Quinta Defendants, benefits financially from room rentals and other incidentals recognized through renting rooms at the brand property in which the Plaintiff was commercially sex trafficked.

s.  Defendant Wyndham, in conjunction with the La Quinta Defendants, has benefited by turning a blind eye to rampant sex trafficking and claiming they have no control over the problem of prostitution and sex trafficking at their properties.

t. Wyndham has successor liability for the supervision and/or operation of the La Quinta hotel located at 4730 West Spruce Street, Tampa, Florida 33607.

15.    At all times relevant to this complaint, Defendants La Quinta Holdings, Inc.; LQ Management L.L.C.; La Quinta Franchising LLC and their successor entities, and Cavalier MergerSub LP f/k/a CorePoint Lodging, Inc., and Wyndham Hotels & Resorts, Inc. ("La Quinta Defendants" or "LQ Defendants") benefited from owning, managing, and operating two hotels where Plaintiff alleges injuries related to her sex trafficking occurred. The La Quinta Defendants that act in unison and together are responsible for Plaintiff's injuries at the La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607, which is owned by CPLG FL Properties, L.L.C. f/k/a LQ FL Properties.

16.    Defendants Wyndham Hotels & Resorts, Inc. ("Wyndham"); La Quinta Holdings, Inc. ("LQH"), La Quinta Management, LLC ("LQM"), and La Quinta Franchising, LLC ("LQF") (collectively, the "La Quinta Defendants") may be collectively referred to as the "Brand Hotel Defendants" or "Brand Hotels."

17.    Whenever reference is made in this Complaint to any act, deed, or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management,

direction, control, or transaction of the ordinary business and affairs of the Defendants.

## JURISDICTION AND VENUE

18.    This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, laws, or treaties of the United States and this Court has supplemental jurisdiction over Plaintiff's claims that do not arise under federal law because each claim is "so related to claims in the action within [this Court's] original jurisdiction that they form part of the same controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted in this action occurred in the judicial district where this action was brought.

## SEX TRAFFICKING UNDER FEDERAL LAW

20.    The requirements for liability under TVPRA § 1595 on a beneficiary theory can be stated as follows: (1) the person or entity must "knowingly benefit[], financially or by receiving anything of value," (2) from participating in a venture, (3) that the "person knew or should have known has engaged in an act in violation of this chapter." 18 U.S.C. § 1595(a).

21.    Sex trafficking is defined by the TVPRA under 22 U.S.C. § 7102, as "the

recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion." This definition combines the three elements of sex trafficking as a criminal offense: the act, the means, and the purpose.

22.     To best understand the mechanism by which sex trafficking is prohibited by federal criminal law, it's best to address these elements in the reverse. Sex trafficking is slavery for the *purpose* of commercial sex, a lens on the already existing crimes prohibited by 18 U.S.C. § 1589 and §1590. The crime of slavery can then be divided into the two (2) elements remaining: the act and the means. The *act* is the "harboring, transporting, providing, or obtaining," of forced labor, codified as a violation of 18 U.S.C. §1590, while the *means* is labor "obtained or provided by force, fraud or coercion" and is codified as a violation of 18 U.S.C. §1589.

23.     Thus, while the complete definition of 'sex trafficking' is found in the TVPRA under 22 U.S.C. § 7102, it is nevertheless a long- recognized and familiar atrocity.

## FACTUAL ALLEGATIONS

### A. BRAND HOTELS CONTROL THE HOSPITALITY INDUSTRY

24.     Upon information and belief, between at least 2008 to 2012 Defendant

Wyndham held meetings among its executives, directors, and managers at which sex trafficking in its hotels was discussed.

25.    Upon information and belief, between at least 2008 to 2012 the La Quinta Defendants held meetings among its executives, directors, and managers at which sex trafficking in their hotels was discussed.

26.    Upon information and belief, between at least 2008 to 2012 the Brand Hotel Defendants held meetings through their trade organizations in which sex trafficking in their hotels was discussed.

27.    Upon information and belief, during at least 2008 to 2012, emails were exchanged by employees of Defendants' respective brands that related to sex trafficking in hotels, including Defendants' hotels.

28.    As industry leaders, Defendants each failed to articulate policy, process, or procedure that would measure the extent of the trafficking problem at their branded locations. They essentially all allowed their colleague brands to perpetuate the lie that sex trafficking was not a problem on their brand properties. Moreover, Defendants did not articulate a policy, process, or procedure that could measure whether the "employee training" had the effect of reducing instances or expected instances of human trafficking.

29.    Defendants collectively declined to implement policies that would likely have the effect of reducing the billions of dollars in sex trafficking profits. As a

whole, Defendants did not call for stricter room rental requirements. For example, Defendants did not require ID or names of every person staying in the room; did not limit the number of people allowed to stay in a room; did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash), and did not monitor reservation patterns maintained and owned by their brand central reservation systems, data of which could only be analyzed by the brand Defendant with backend access.  In short, Defendants refused to communicate to traffickers "your business and your money are not welcome here."

30.    Through this coordinated effort, Defendants were able to rest assured they would not have to implement effective policies and procedures. Given that human trafficking does more than $100 billion in business a year and the fact that a large percent of all trafficking ventures occurs at hotels and motels—there can be no doubt that Defendants, as an industry, generate billions of dollars every year from human trafficking ventures.

31.    Defendants' coordinated efforts created an industry standard of giving lip service to tackling human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a national branded property that put together a policy that eliminated trafficking from their branded properties. While it would be

challenging and expensive (both business expenses and lost revenues from traffickers) to implement effective policies, it is apparent that an effective policy would create a long-term competitive advantage for the individual defendant. In short, a business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

### B.  THE DEFENDANTS' ACTUAL AND/OR CONSTRUCTIVE KNOWLEDGE OF SEX TRAFFICKING AT THEIR HOTELS

32.    Defendants have been on notice of repeated incidences of sex trafficking occurring at their brand hotels, yet they failed to take the necessary action to meaningfully address sex trafficking and still persist in failing to take the necessary action to meaningfully address sex trafficking at their hotels.

33.    Several courts have found failure to implement policies sufficient to combat a known problem in one's operations can rise to the level of willful blindness or negligence.[2]

---

[2] *See Brown v. Corr. Corp. of Am.*, 603 F.Supp.2d 73, 81 (D.D.C. Mar. 26, 2009); *Trollinger v. Tyson Foods, Inc.*, 2007 WL 1574275, at *12 (.E.D. Tenn. May 29, 2007).

34.    The CPLG Defendants and the La Quinta Defendants had actual and/or constructive knowledge of sex trafficking, including A.D.'s sex trafficking and victimization, occurring on their La Quinta-branded property via the following:

a. Defendants CPLG and LQH own, supervise, or operate the La Quinta Inn® located at 4730 West Spruce Street, Tampa, Florida 33607. LQH failed to implement and enforce any of its own policy or policies and protect Plaintiff A.D. from being sex trafficked.

b. Defendants CPLG and LQH had actual knowledge of sex trafficking occurring on its branded hotel property because CPLG and LQH and La Quinta Inn® knew that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. CPLG, LQH and La Quinta Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta Inn®, CPLG, LQH and La Quinta Inn® facilitated the trafficking through its practices, policies, and procedures. CPLG, LQH and La Quinta Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that CPLG, LQH and La Quinta Inn® continue to profit from

the business that trafficking brings, including business from out-of-state.

c.  Defendants CPLG and LQH had constructive knowledge of sex trafficking occurring on its branded hotel properties because CPLG, LQH and La Quinta Inn® knew or should have known that sex trafficking and prostitution are associated with a high risk of physical and sexual violence, substance abuse, and other illegal dangerous conduct, and that the pimp-sex trafficking victim/prostitute relationship involves the use of force, fraud, and coercion. CPLG, LQH and La Quinta Inn® allowed, authorized, permitted, induced, or encouraged the trafficking of individuals for sex at the La Quinta. CPLG, LQH and La Quinta Inn® facilitated the trafficking through its practices, policies, and procedures. CPLG, LQH and La Quinta Inn® failed to take appropriate action to prevent the trafficking of individuals for sex so that CPLG, LQH and La Quinta Inn® continue to profit from the business that trafficking brings, including business from out-of-state.

d.  Defendants CPLG and LQH knew or should have known that the La Quinta Inn® hotel where Plaintiff A.D. was trafficked was an area known for high incidence of crime and prone to sex trafficking

activity on and around the hotel premises, including when Plaintiff A.D. was trafficked.

e.  Despite having knowledge of the extensive prostitution and sex trafficking that occurs at its hotels, Defendants CPLG and LQH has repeatedly failed to stop these actions.

f.  Defendants CPLG and LQH was in an agency relationship with La Quinta Inn® branded hotels offering public lodging services in the hotel. This agency relationship was created through Defendants CPLG and LQH's exercise of an ongoing and systemic right of control over La Quinta Inn® hotels by Defendants CPLG and LQH's operations, including the means and methods of how La Quinta Inn® branded hotels conducted daily business through one or more of the following actions:

  i.  providing the software, hardware, and platforms where suspicious activity or other concerns could be addressed with the Brands;

  ii.  providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

  iii.  providing new hire orientation on human rights and corporate responsibility;

iv.   providing training and education to La Quinta® branded hotels through webinars, seminars, conferences, and online portals;

v.   providing and controlling customer review and response platforms;

vi.   hosting online bookings on Defendants CPLG and LQH's domain;

vii.   requiring La Quinta® branded hotels to use Defendants CPLG and LQH's customer rewards program;

viii.   requiring La Quinta® branded hotels to use Defendants CPLG and LQH's property management software;

ix.   requiring La Quinta® branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

x.   providing IT support for all property management systems, owned, operated and required by CPLG and LQH;

xi.   setting employee wages;

xii.   making employment decisions;

xiii.   advertising for employment;

    xiv.  sharing profits;

    xv.  the ability of Defendants CPLG and LQH to cancel any agreement with the La Quinta Inn if rules are violated;

    xvi.  regular inspection of the La Quinta Inn hotels and operations or management by Defendants CPLG and LQH;

    xvii.  standardized training methods for employees;

    xviii. building and maintaining the facility in a manner specified by the owner;

    xix.  standardized or strict rules of operation;

    xx.  regular inspection of the facility and operation by owner;

    xxi.  fixing prices; or

    xxii.  other actions that deprive La Quinta® branded hotels of independence in business operations.

g. An apparent agency also exists between Defendants CPLG and LQH and the La Quinta Inn® hotels. Defendants CPLG and LQH held out La Quinta Inn® branded hotels to the public as possessing authority to act on its behalf.

h. Given Defendants CPLG and LQH's public statements on behalf of its hotel brands and the control it assumed in educating,

implementing, and directing its branded hotels, including La Quinta Inn® branded hotels, Defendants CPLG and LQH breached its duties in the following ways:

i.     did not adequately distribute information to assist employees in identifying human trafficking;

ii.    failed to provide a process for escalating human trafficking concerns within the organization;

iii.   failed to mandate managers, employees, or owners attend training related to human trafficking;

iv.    failed to provide new hire orientation on human rights and corporate responsibility;

v.     failed to provide training and education on human trafficking through webinars, seminars, conferences, and online portals;

vi.    failed to develop and hold or require ongoing training sessions on human trafficking; or

vii.    failed to provide checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention.

i.  For years, Defendants CPLG and LQH has demonstrated actual and/or constructive knowledge of the rampant culture of sex trafficking which tragically occurs on its La Quinta Inn® branded properties throughout the country. This same entrenched, pervasive actual and/or constructive knowledge of sex trafficking facilitated the sex trafficking of Plaintiff A.D. at La Quinta Inn® hotel that forms the basis of this complaint.

    i.  In August 2008, a woman was arrested for running an escort service out of various hotels in Bergen, Passaic, Hudson, and Essex counties, which included the La Quinta Hotel on Route 46. [3]

    ii.  In July 2009, a Cambridge pimp whose mom was a well-known political staple in the city was arrested after police found a woman set up in a prostitution scheme in the La Quinta Inn in Somerville. [4]

    iii.  In November 2013, the La Quinta Inn in San Diego,

---

[3] *Paterson woman charged with running local prostitution service*, THE PROGRESS (Aug. 15, 2008), available at https://www.newjerseyhills.com/the_progress/news/paterson-woman-charged-with-running-local-prostitution-service/article_bb36894b-ee4c-5bdf-9b5c-e1873080b1f9.html.

[4] *Former state rep's son accused of being a pimp; says he was 'helping' hooker*, METROWEST DAILY NEWS (Jul. 1, 2009), https://www.metrowestdailynews.com/article/20090701/News/307019964

California was sued by the City Attorney's Office for its history of illegal activity. Police had made several prostitution arrests in a short span of time and often found several prostitutes on site at the hotel. In reaching a settlement with the property and franchise owners, the hotel agreed to toughen its policies, add cameras, and check identification of guests and visitors. [5]

iv.   In February 2016, a La Quinta Inn owner was arrested during a prostitution bust. One woman was arrested for prostitution and the owner was arrested for tipping the woman off when police arrived. Police also said the owner knew that the woman was using the room at the La Quinta to solicit prostitution. [6]

j.   Additionally, Defendants CPLG and LQH has been aware of sex trafficking occurring on La Quinta Inn brand properties through publicly available online review websites such as

---

[5] *City atty.: Hookers worked out of La Quinta Inn*, THE SAN DIEGO UNION-TRIBUNE (Nov. 21, 2013), https://www.sandiegouniontribune.com/sdut-la-quinta-inn-prostitution-rancho-penasquitos-2013nov21-story.html.
[6] *La Quinta Inn Hotel Owner Arrested in Prostitution Bust*, SPECTRUM NEWS (Feb. 27, 2016), https://spectrumlocalnews.com/nys/buffalo/news/2016/02/27/hotel-owner-arrested-in-prostitution-bust.

www.tripadvisor.com. Online reviews show the pervasiveness of customer reported sex trafficking on La Quinta Inn® brand properties and Defendant CPLG and LQH's inattentiveness, for example:

i.    Regarding a January 2009 stay at a La Quinta Inn in Elmsford, New York, a customer wrote: "Also to make my trip exciting was the hooker that keeps going to the back door to meet her [trick]. Blondie has quit a business going on I smoke so I would go outside to have a [cigarette] and a few times I was approached by her trick and would have to tell him she was at the door waiting. It was very uncomfortable. Even my pregnant daughter was approached. By our third night a new hooker had come to stay."[7]

ii.   In December of 2009, a reviewer described the La Quinta in Fort Lauderdale, Florida as follows: "But I personally don't like to be approached by prostitutes or watch them

---

[7] Review of La Quinta Inn & Suites by Wyndham White Plains – Elmsford, Elmsford, New York (Jan. 7, 2009), available at https://time.com/3525640/sex-trafficking-victim-prostitution-hotel/.

hang around the front desk and socialize with the staff."[8]

iii.    Regarding a November 2013 stay at a La Quinta Inn in Milwaukee, Wisconsin, a customer wrote: "…The first thing I noticed when we pulled up was the obvious hooker outside… This hotel is SUPER gross. It's just a hang out for prostitutes and drug users. The staff is obviously either partaking, or allowing it to happen. Either way, this hotel management needs to think about hiring new people who won't turn their hotel into a sleazy, disgusting mess…" [9]

iv.    In March of 2015, a reviewer described the La Quinta in Jacksonville, Florida as follows: "2nd time staying here and both times they had hookers in the lobby and sitting in cars in the parking lot. While unloading the car I saw a drug deal going on and when we left the guy was sitting at the side of the building. What really got me was the

---

[8] Review of La Quinta Inn by Wyndham Ft. Lauderdale Tamarac East (Dec. 4, 2009), available at https://www.tripadvisor.com/ShowUserReviews-g34227-d224784-r50604892-La_Quinta_Inn_by_Wyndham_Ft_Lauderdale_Tamarac_East-Fort_Lauderdale_Broward_County_.html

[9] Review of La Quinta Inn by Wyndham Milwaukee Glendale Hampton Ave (Dec. 3, 2013), *available a*t https://www.tripadvisor.com/ShowUserReviews-g59917-d240573-r186657751-La_Quinta_Inn_by_Wyndham_Milwaukee_Glendale_Hampton_Ave-Glendale_Wisconsin.html.

hookers hanging out at the front desk."[10]

    v.   Regarding a March 2016 stay at a La Quinta Inn in Sacramento, California, a customer wrote: "Unfortunately, this motel is used by many people who use drugs and many of the purchases occurred in the back-parking lot. There were also prostitutes and their guests. If you're not into this I recommend you choose another motel." [11]

   k.  Upon information and belief, the branded properties depend on Defendants CPLG and LQH for notification of negative customer reviews.

   l.  Upon information and belief, Defendants CPLG and LQH, not the branded properties, house and control the data regarding customer reviews.

**C.    THE SEX TRAFFICKING OF A.D. AT LA QUINTA BY WYNDHAM TAMPA BAY AIRPORT**

35.    One of the lives devalued and otherwise adversely affected by the hospitality industry's inattention to the prevention and eradication of sex

---

[10] Review of La Quinta Inn & Suites by Wyndham Jacksonville Mandarin (Mar. 7, 2015), available at https://www.tripadvisor.com/ShowUserReviews-g60805-d120186-r258296436-La_Quinta_Inn_Suites_by_Wyndham_Jacksonville_Mandarin-Jacksonville_Florida.html

[11] Review of La Quinta Inn by Wyndham Sacramento North (Mar. 8, 2016), *available at* https://www.tripadvisor.com/ShowUserReviews-g32999-d79713-r354487204-La_Quinta_Inn_by_Wyndham_Sacramento_North-Sacramento_California.html.

trafficking was that of A.D.

36.     In November of 2011, A.D. met a man who she was interested in ("hereinafter referred to as "Trafficker 2"). He took advantage of her innocence and forced her into a sexual encounter. Trafficker 2 subsequently courted her and manipulated her into thinking they were in love. While "dating," Trafficker 2 would manipulate A.D. into numerous non-consensual sexual encounters; forced her to take drugs; and take the blame for his criminal acts. Trafficker 2 would consistently take advantage of A.D. and would soon sex traffick her in hotels throughout Central Florida.

37.     After months of "dating," Trafficker 2 suggested A.D. move in together. Because he was a convicted felon and registered sex offender, he forced A.D. to enter into a lease agreement. In order to make money to sustain their life together, Trafficker 2 suggested A.D. work to make extra money.

38.     Under the ruse of a modeling job advertised on Backpage.com, Trafficker 2 forced A.D. to work. During her "interview" for the modeling job, A.D. met a man (hereinafter referred to as "Trafficker 1") who raped her into submission.

39.     While victimized by her traffickers, A.D. was subjected to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendants' hotel property between approximately April 2012 and July 2012.

40.    Plaintiff A.D. was subjugated to sex trafficking at the La Quinta® by Wyndham Tampa Bay Airport ("La Quinta Tampa Bay Airport") located at 4730 W Spruce St., Tampa, FL 33607 between approximately April 2012 to July 2012.

41.    Trafficker 2 advertised A.D. on Backpage.com, which would include the intersection on which the hotel was located.

42.    For approximately three months, A.D. rented rooms as instructed by Trafficker 2 under her name using cash or prepaid credit card.

43.    A.D. was never allowed to leave the room. Because she was confined to her hotel room for several days at a time, Trafficker 2 would bring food to the room. To keep her confined and unable to escape, Trafficker 2 would arrange buyers to come to the hotel room. There was a parade of unregistered male guests coming in and out of her hotel room at all times of day. A.D. was sexually abused and exploited numerous times at the La Quinta Tampa Bay Airport. This procession of men would have been open and obvious to anyone working at the La Quinta Tampa Bay Airport.

44.    Through hotel staff and employees, Defendants knew or should have known that A.D. was being trafficked for sex due to several well-known red flags, including but not limited to:

    a.    Large amounts of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related

items in the hotel rooms;

b. Payments for the rooms in cash, or cash substitutes such as a prepaid Visa gift card;

c. A.D.'s physical appearance (malnourished, bruised, beaten, drugged, and inappropriate attire);

d. A continuous procession of men entering and leaving A.D.'s room;

e. Excessive requests for sheets, cleaning supplies, towels, and room service;

f. The personal relationship between various hotel staff and A.D.'s trafficker; and

**D.    DEFENDANTS FACILITATED THE TRAFFICKING OF A.D.**

45.    Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided, enabled, and facilitated the sex trafficking of A.D. The Defendants leased rooms to A.D.'s traffickers when they knew, or should have known, that her trafficker was using their room to subject A.D. to repeated exploitation as he forced her into sexual servitude.

46.    Defendants knew, or should have known, that A.D. was being trafficked and that the Defendants were knowingly benefiting financially from said exploitation, because A.D.'s trafficker frequented the Defendants' hotel.

47.    Defendants knew, or should have known, that A.D. was being trafficked

because A.D. constantly entertained traffic to appease her traffickers' daily quotas and their behavior indicated they were using the Defendants' hotel for his illegal sex trafficking activities.

48.    Defendants actively participated in this illegal endeavor by knowingly or negligently providing lodging in which to harbor A.D. while he was trafficking her.

49.    Defendants profited from the sex trafficking of A.D. and knowingly or negligently aided and participated with A.D.'s trafficker with his criminal activity. The Defendants took no action as A.D. repeatedly visited the hotel, often with different guests, avoiding eye contact, and dressing inappropriately for the weather.

50.    The Defendants all had the opportunity to stop A.D.'s trafficker and offenders like him from victimizing A.D. and others like her. Instead, every Defendant failed to take reasonable measures to stop sex trafficking from occurring in their hotels.

51.    The Defendants all financially benefited from the sex trafficking of A.D., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers alike.

52.    Defendants benefit from the steady stream of income that sex traffickers bring to their hotel brands.

53.    Defendants financially benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

54.    Defendants have long been aware that free Wi-Fi is attractive to traffickers yet failed to provide adequate security to protect Plaintiff, including adequate measures to monitor Wi-Fi access. The myriad types of electronically stored information ("ESI") generated in the use of a Wi-Fi network can manage and track communications and activity originating from devices granted access. By way of the ESI generated through the use of Defendants' Wi-Fi networks, Defendants had information in their custody, control, and possession that enabled them to identify the purpose for which their Wi-Fi network and their property were being used and by which they profited.

55.    Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to improve awareness of sex trafficking and/or prevent sexual exploitation on their property despite assurances to the public, guests, and other stakeholders that they were taking these steps.

56.    Defendants maintained their deficiencies to maximize profits by:

    a.    Reducing the cost of training employees and managers on how to spot the signs of human trafficking and sexual exploitation and what steps to take;

b.  Lowering operating costs and management costs by not analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the issues at relevant locations or else hold the franchisee accountable and terminate their franchise agreement;

c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.  Not refusing room rentals, or reporting guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

e.  Lowering security costs by not having proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation.

57.  As a direct and proximate result of these egregious practices on the part of the Defendant Hotel, A.D. and victims of sex trafficking and exploitation like

her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

**CAUSES OF ACTION**
**A.    COUNT ONE – 18 U.S.C §1595 ("TVPRA")**
**(Against all Defendants)**

58.    The Plaintiff A.D. incorporates each foregoing allegation.

59.    A.D. is a victim of sex trafficking within the meaning of 18 U.S.C. §1591(a) and is therefore entitled to bring a civil action under 18 U.S.C. §1595.

60.    The Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. §1595. Specifically, the Defendants had a statutory obligation not to benefit financially from a venture that they knew, or should have known, to engage in violations of 18 U.S.C. §1591 (a). At all relevant times, the Defendants breached this duty by participating in a venture which facilitated the harboring and providing of A.D. for the purposes of commercial sex induced by force, fraud, or coercion, by their acts, omissions, and commissions.

61.    The Defendants have financially benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade. Moreover, the Defendants directly benefited from the trafficking of A.D. on each occasion they received payment for rooms that she was being kept in at

the Defendants' hotels. The actions, omissions, and/or commissions alleged in this pleading were the but-for and proximate cause of A.D.'s injuries and damages.

62.    A.D. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at the Defendants' hotel and property in violation of 18 U.S.C. §1591(a).

## PRAYER FOR RELIEF

WHEREFORE the Plaintiff requests that the jury selected to hear this case render a verdict in her favor on all counts alleged, and against each and every named Defendant, separately and severally, and that its awards damages to her in an amount which will adequately compensate her for the injuries and damages she sustained due to the Defendants' conduct outlined as follows:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

    b.  past and future medical expenses, as well as the costs associated with past and future life care;

        a.  past and future emotional distress;

        b.  consequential and/or special damages;

        c.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

        d.  disgorgement of profits obtained through unjust enrichment;

e. restitution;

f. punitive damages with respect to each cause of action;

g. reasonable and recoverable attorneys' fees;

h. costs of this action; and

i. pre-judgment and all other interest recoverable

Also, on the basis of the foregoing, the Plaintiff requests that a jury be selected to hear this case and render a verdict for the Plaintiff, and against the Defendants, and that its awards damages to the Plaintiff in an amount which adequately reflects the enormity of the Defendants' wrongs, and which will effectively prevent other similarly caused acts. Further, the Plaintiff requests that the Court enter judgment consistent with the jury's verdict, and prays for any other damages and equitable relief the Court or jury deems appropriate under the circumstances.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated: October 11, 2022                    **RESPECTFULLY SUBMITTED,**

_/s/ Kathryn L. Avila_
**Kathryn L. Avila** (Fla. Bar No. 1019574)
**Emmie J. Paulos** (Fla. Bar No. 99010)
LEVIN PAPANTONIO RAFFERTY
316 S. Baylen St. Suite 600
Pensacola, Florida 32502
T: 850-436-6246
F: 850-436-6271
E: kavila@levinlaw.com /

epaulos@levinlaw.com

***Attorneys for Plaintiff***